UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

BRIAN BISHOP AND RACHEL BISHOP                                    PLAINTIFFS

VS.                                    CIVIL ACTION NO. 4:10CV49TSL-LRA

ALFA MUTUAL INSURANCE COMPANY                                    DEFENDANT

MEMORANDUM OPINION AND ORDER

     This cause is before the court on the motion of defendant
Alfa Mutual Insurance Company (Alfa) for summary judgment pursuant
to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiffs
Brian Bishop and Rachel Bishop have responded to the motion and
the court, having considered the memoranda of authorities,
together with attachments, submitted by the parties, concludes
that the motion is well taken and should be granted.

     On February 26, 2010, plaintiffs Brian Bishop and Rachel
Bishop filed suit in the Circuit Court of Wayne County,
Mississippi, against Arthur Sturdivant and Alfa Mutual Insurance
Company (Alfa), seeking damages from Sturdivant for alleged
negligence and breach of contract, and benefits under their
homeowners' insurance policy with Alfa for damages in and to their
home caused by Chinese-manufactured drywall which Sturdivant, a
home builder, had used in the construction of their home.  In
their complaint, the Bishops allege that in April 2008, they
purchased and took possession of a home in Waynesboro, Mississippi

that had been newly constructed in 2007 by home builder Arthur
Sturdivant.  Subsequently, in 2009, the Bishops began noticing
unexplained noxious odors, damage to appliances and damage to
exposed metals in the house.  They also began experiencing adverse
health effects, which forced them and their two minor children to
move out of the home and into a camper on the property.  Although
plaintiffs initially were unaware of the cause of the problems
they were experiencing, at some point, they learned that the home
"had been constructed with defective Chinese manufactured drywall
that was causing all of the problems in the home, the unexplained
adverse health effects, and causing the home to be
uninhabitable."[1]

---

[1]    The Bishops' experience is not uncommon.  As the court
explained in In re Chinese Manufactured Drywall Products Liability
Litigation, 706 F. Supp. 2d 655 (E. D. La. Apr. 8, 2010), from
2004 through 2006, a shortage of construction materials in the
United States, including drywall, resulted in the importation of
Chinese-manufactured drywall, which was used primarily in the
construction and refurbishing of homes in coastal areas of the
United States, notably the Gulf Coast and East Coast.  Id. at 659.
    Sometime after the installation of the Chinese drywall,
    homeowners began to complain of emissions of smelly
    gasses, the corrosion and blackening of metal wiring,
    surfaces, and objects, and the breaking down of
    appliances and electrical devices in their homes, and
    many began to complain of various physical afflictions
    believed to be caused by the Chinese drywall, all of
    which led to the filing of lawsuits in state and federal
    courts against homebuilders, developers, installers,
    realtors, brokers, suppliers, importers, exporters,
    distributors, and manufacturers who were involved with
    the Chinese drywall.
Id.  As the court went on to explain, the Chinese-manufactured
drywall at issue in these cases differs from typical, benign
drywall for the following reasons:

The Bishops sued Sturdivant for negligence and breach of contract, and Alfa for its alleged wrongful denial of their claim for benefits under their homeowners' policy.  Alfa removed the case to this court on the basis of diversity jurisdiction. Thereafter, on motion of the parties, the court severed and remanded the claims against Sturdivant, but retained jurisdiction over the Bishops' claims against Alfa.  Alfa then filed a separate action against the Bishops for a declaratory judgment that its

---

1. Chinese drywall has a significantly higher average concentration of strontium and significantly more detectable levels of elemental sulfur.
2. Chinese drywall releases reduced sulfur gases. ...  These emissions are also confirmed by strong odors.
3. The sulfur gases released by Chinese drywall are irritating to the human body. ...  Exposed individuals reported irritation of the eyes, respiratory system, and skin, among other things.
4. The sulfur gases released by Chinese drywall cause offending odors in homes, making them hard if not impossible to live in. ...
5. The sulfur gases released by Chinese drywall are corrosive to metals, particularly copper and silver. ... "Corrosion" is defined by the ASTM as the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties.  Copper and silver metal components in [homes] are extremely vulnerable to corrosion from exposure to the sulfur gases. ...  The sulfur gases, in reacting with metals, form sulfide deposits on the surfaces of the metals. ...  For example, a reaction of sulfur gases with copper pipes will form copper sulfide on the metals. ...  The reaction of sulfur gases with metals can be said to be "consuming" the useful, pure metals by replacing those metals with sulfides. ...
6. The corrosion on metals caused by the sulfur gases emitted by Chinese drywall causes premature failure of electrical & mechanical devices. ...

Id. at 663-666.

policy provides no coverage for the Bishops' losses caused by the Chinese-manufactured drywall.  The two cases have since been consolidated.

In its present motion, Alfa asserts it is entitled to summary judgment declaring that its policy affords no coverage for the Bishops' claims.  Alfa contends there is no coverage in effect for any of the Bishops' claimed losses, which include damage to the home's HVAC system, discoloration of the electrical wiring and the copper lines on the hot water heater, damaged personal property including a television and direct TV converter, respiratory illness and severe headaches experienced by family members, and the purchase of a travel trailer in late June 2009 when the home became uninhabitable.

Pertinent Policy Provisions

As is relevant here, Section I of Alfa's policy provides coverage for "accidental direct physical loss" to "the dwelling used principally as a private residence on the residence premises" (Coverage A); for "direct physical loss" to the insured's personal property where such loss is caused by any one of certain specifically listed perils (Coverage B); and for loss of use of the premises, if a covered loss under Section I makes the residence uninhabitable (Coverage D).

The policy contains exclusions under Coverages A and B for "any loss to the property ... which is directly or indirectly

4

caused by one or more of (certain listed) perils, including, in

pertinent part:

> h.   inherent vice, latent defect and mechanical
>      breakdown or any quality in property that causes it
>      to damage or destroy itself;

> i.   corrosion, electrolysis or rust;
>      ... and

> l.   contamination....

As to these exclusions, there is an "ensuing loss" provision which

states:

> We do insure for any resulting loss from [the listed
> perils] provided that the loss itself is a loss insured
> by Section I.

The policy additionally excludes coverage for "any loss directly

or indirectly caused by ...  defect, weakness, inadequacy, fault

or unsoundness in ... materials used in construction or repair."

There is also an "ensuing loss" exception with regard to this

exclusion, which states:

> We do insure for any ensuing loss from [this item]
> unless the ensuing loss is itself a loss not insured by
> Section I.

> Alfa contends the Bishops' claim for recovery for damage to

items of personal property is not covered since there was no

direct physical loss to such property from a named peril; that

losses for damage to the dwelling, including damage to wiring,

appliances and the HVAC system, fall within one or more exclusions

from coverage; and that their claims for alleged personal injuries

and for the purchase of the travel trailer are not covered.

Personal Property Loss

Under the policy, there is no coverage for direct physical loss to personal property unless the loss is caused by any of sixteen perils listed in the policy.[2]  Alfa argues that Chinese-manufactured drywall does not fall under any of the listed perils and that the policy therefore does not provide coverage for the damage to the Bishops' television and direct TV converter.  In response, the Bishops assert that their personal property loss from the effects of the Chinese drywall implicates the "Sudden and

---

[2]    The listed perils are:
1.  FIRE OR LIGHTNING.
2.  WINDSTORM OR HAIL....
3.  EXPLOSION.
4.  RIOT OR CIVIL COMMOTION.
5.  AIRCRAFT, MISSILES AND SPACECRAFT....
6.  VEHICLES....
7.  SMOKE....
8.  VANDALISM OR MALICIOUS MISCHIEF....
9.  THEFT....
10. FALLING OBJECTS....
11. WEIGHT OF ICE, SNOW OR SLEET....
12. SUDDEN AND ACCIDENTAL DISCHARGE OR OVERFLOW OF
    WATER OR STEAM ... within a plumbing, heating, air
    conditioning or automatic fire protective sprinkler
    system or from within a household appliance....
13. SUDDEN AND ACCIDENTAL TEARING APART, CRACKING,
    BURNING OR BULGING of a steam or water heating
    system or appliance, an air conditioning or
    automatic fire protective sprinkler system....
14. FREEZING of a plumbing, heating or air conditioning
    or automatic fire protective sprinkler system or of
    a household appliance....
15. SUDDEN AND ACCIDENTAL DAMAGE to electrical
    appliances, devices, fixtures; and wiring, tubes,
    transistors, electronic components or circuitry that
    are a part of appliances, computers, home
    entertainment units caused by an increase or decrease
    of artificially generated electrical current.
16. BREAKAGE OF GLASS....

Accidental Damage" peril, which provides coverage for loss caused by:

> SUDDEN AND ACCIDENTAL DAMAGE to electrical appliances, devices, fixtures; and wiring, tubes, transistors, electronic components or circuitry that are a part of appliances, computers, home entertainment units caused by an increase or decrease of artificially generated electrical current.

Clearly, however, while a television and direct television converter do fall with the *types* of items listed in this peril, under its plain wording, this paragraph extends coverage only when the damage is sudden and accidental and caused by "an increase or decrease of artificially generated electrical current." As Alfa correctly points out, Chinese drywall and its off-gassing tendencies are not "an increase or decrease of artificially generated electrical current," and there is consequently no coverage for the Bishops' claimed personal property loss.

        Exclusions from Coverage

    Alfa does not dispute that the Bishops have sustained "accidental direct physical loss" to their home caused by the Chinese drywall, but it contends that all the claimed losses fall within one or more of the referenced policy exclusions. For the reasons that follow, while the court is unable to conclude that the "latent defect" exclusion applies, and the court is of the opinion that the "inherent vice" exclusion is inapplicable, the court does find that the exclusions for losses from faulty materials, contamination and corrosion apply to preclude coverage for any of the Bishops' claimed losses.

7

Latent Defect

The policy excludes from coverage losses caused by "latent defect" but does not define the term, and there are no Mississippi cases which define the term.  However, as this is a standard exclusion in a homeowners' policy, it is not difficult to find cases that have addressed its meaning, including cases involving Chinese drywall.

In Travco Insurance Co. v. Ward, 715 F. Supp. 2d 699 (E.D. Va. 2010), the court held that losses to the insured home from defective Chinese Drywall fit squarely within Virginia's definition of "latent defect," as "flaws in property that are undetectable, and hence unexpected," id. at 710 (citing Glens Falls Ins. Co. v. Long, 195 Va. 117, 77 S.E.2d 457, 459 (1953), which defined "latent defect" as "defect which reasonably careful inspection will not reveal"), and which are "'integral to the damaged property by reason of its design or manufacture or construction,'" id. (quoting U.S. West v. Aetna Cas. & Sur. Co., 117 F.3d 1415 (4th Cir. 1997)).  However, while the court held that damage to the house itself was excluded, it held that the exclusion did not apply to damage to the home's air conditioner and garage door, reasoning that "[t]he Chinese Drywall in the Ward Residence is not integral to the damaged air conditioner or garage door.  To the contrary, there is no indication that the air conditioner or the garage door were manufactured or constructed in a defective manner."  Id. at 711.

8

The court in In re Chinese Manufactured Drywall Products Liability Litigation (In re Chinese Drywall Litigation), 759 F. Supp. 2d 822 (E.D. La. Dec. 16, 2010), concluded that the analysis in Travco, while thorough and sound, could not be given much weight in a case involving Louisiana law, since Louisiana has a different definition of "latent defect" than Virginia:  "The definition of latent defect under Louisiana law requires that the defect be hidden and not discoverable upon a reasonable, customary inspection or test."  Id. at 836 (citing Nida v. State Farm Fire & Cas. Co., 454 So. 2d 328, 335 (La. App. 3 Cir. 1984)).  The court considered it a "close call" whether the latent defect exclusion applied to the losses from the Chinese drywall, noting that while the insureds "were not aware that their homes contained Chinese-manufactured drywall and the damages to their homes were caused by this drywall until they learned of the problem through the media or otherwise," they "were aware before the media reports that their homes contained a foul odor, their electrical wires and components were blackened, and their electrical devices and appliances were failing."  Id. at 838.  It was unclear to the court "whether the latent defect exclusion is avoided through knowledge or discoverability of the specific cause of defects in an insured property or simply by the knowledge of the defects themselves," and ultimately, being "unable to make a definitive determination as to whether the damage caused by the Chinese drywall in the Plaintiffs' homes constitutes a latent defect," the

court concluded the insurers had failed to meet their burden to prove applicability of the latent defect exclusion.  Id. at 838-39.

More recently, in Ross v. C. Adams Construction & Design, L.L.C., --- So.3d ----, 2011 WL 2328271 (La. App. 5 Cir. June 14, 2011), the court, applying an identical Louisiana definition of "latent defect," found a "latent defect" where the Chinese drywall that caused the damages sustained by homeowners "was hidden and unknown for two years."  2011 WL 2328271.

The "latent defect" definition cited in In re Chinese Drywall Litigation and Ross, i.e., as "a defect that is hidden or concealed from knowledge, as well as from sight, and which a reasonable customary inspection would not reveal," Ross, 2011 WL 2328271, is typical.  See Black's Law Dictionary, 794 (5th ed. 1979) (defining "latent defect" as "[a] hidden or concealed defect ... which could not be discovered by reasonable and customary inspection,"); Couch on Ins. § 153:77 (3d ed. 2010) (defining "latent defect" as "an imperfection in the materials used which could not be discovered by any known and customary test") (citations omitted).

The Chinese drywall in the Bishops' home was defective from the time it was initially installed, although the defect did not manifest itself until some time after they had begun living in the home.  Even then, the Bishops were unaware initially that the cause of the problems they were experiencing with their home was

10

the Chinese drywall (there is nothing to indicate they were aware their home had been constructed with Chinese drywall); and they allegedly only discovered through media reports and subsequent investigation that Chinese drywall was the likely culprit.  These facts would certainly tend to suggest the defect was latent.  However, as the court recognized in In re Chinese Drywall Litigation, it is Alfa's burden to prove that the exclusion applies, see Commercial Union Ins. Co. v. Byrne, 248 So. 2d 777, 782 (Miss. 1971), and while Alfa has plausibly argued that the Chinese drywall was a "latent defect," it has not actually proven that the defective drywall could not have been discovered by any known and customary test.  The court therefore is unable to conclude on the present motion that the "latent defect" exclusion applies.

Inherent Vice

The Alfa policy excludes coverage for an "inherent vice," but it does not define "inherent vice," and neither does Mississippi law.  Other courts have defined "inherent vice" as "any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time," or "as a cause of loss not covered by the policy, does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction.  The vice must be inherent in the property for which recovery is sought." GTE Corp. v. Allendale Mutual Ins. Co., 372

F.3d 598, 611 (3d Cir. 2004) (internal quotations and citations omitted).  As the Bishops note, in Finger v. Audubon Insurance Co., 2010 WL 1222273 (La. Civ. D. Ct. March 22, 2010), the court applied a similar definition under Louisiana law, i.e., the "inherent vice ... exclusion applies to a loss due to any quality in property that causes property to damage or destroy itself that results from something within the property itself as opposed to some outside force," id. at 6-7 (citation omitted), noting that "[f]irst party policies typically exclude damages due to an inherent vice . . . in order to prevent the insurer from having to compensate the insured for property that has its own shelf life and will eventually wear out or break down because of intrinsic quality or nature," id. at 7.[3]  In Finger, the court found that since there was no evidence that the Chinese drywall in the insured's home "[was] damaging or destroying itself, ... the 'inherent vice' ... language ... does not apply."  Id.  Likewise, in this case, there is no evidence that the Chinese drywall in the

_____

[3]      The court notes that in Finger, the court applied the identical definition to the "latent defect" exclusion, notwithstanding that these are separate exclusions.  See Finger v. Audubon Insurance Co., 2010 WL 1222273 (La. Civ. D. Ct. March 22, 2010).  While this court finds the Finger court's analysis correct with respect to the "inherent vice" exclusion, its purported analysis of the "latent defect" exclusion is not helpful.  See In re Chinese Manufactured Drywall Products Liability Litigation, 759 F. Supp. 2d 822, 837 (E.D. La. 2010)(observing that Finger court's "characterization of latent defect ... commingles the definitions of latent defect and inherent vice and is misplaced for purposes of the present motions").

Bishops' home is damaging or destroying itself, and the court thus concludes that the "inherent vice" exclusion does not apply.

Contamination

Alfa's policy also excludes damages for losses caused by "contamination."  Both Travco and In re Chinese Drywall Litigation considered exclusions for losses caused by contaminants, but they did so in the context of traditional pollution exclusions, which defined "pollutants" to include "contaminants."  The court in In re Chinese Drywall Litigation concluded the pollution exclusion did not apply to the losses from the Chinese-manufactured drywall since Louisiana law interprets such pollution exclusions to apply only to traditional industrial environmental pollution claims.  In re Chinese Drywall Litigation, 759 F. Supp. 2d at 841.[4]  In contrast, the court in Travco held that losses from Chinese drywall were covered by the exclusion since Virginia law does not limit applicability of pollution exclusions to traditional environmental pollution and since the losses were caused by a contaminant.  Travco, 715 F. Supp. 2d at 717.  In support of the latter conclusion, the court wrote:

---

[4]      The court notes that in the recently-decided Ross v. C. Adams Construction & Design, L.L.C., --- So.3d ----, 2011 WL 2328271 (La. App. 5 Cir. June 14, 2011), the court did not recognize this limitation, and held that "[t]he sulfuric gas emitted from the Rosses' drywall qualifies as a pollutant pursuant to this definition in the policy.  Therefore, any damage caused by the release of these gases is excluded from coverage by the homeowners insurance policy."

> Although the Drywall itself may not be a pollutant, the
> gases it releases are.  There is no dispute that the
> Chinese Drywall has released reduced sulfur gases into
> the Ward Residence. ... [T]he broad definition of
> pollutants in the Policy includes "any solid, liquid,
> gaseous or thermal irritant or contaminant, including
> smoke, vapor, soot, fumes, acids, alkalis, chemicals and
> waste."  Under any reasonable definition of these terms,
> the gases released into the Ward Residence qualify as
> irritants and contaminants.

Id. at 715.

Since the contamination exclusion in Alfa's policy does not

appear in the context of a pollution exclusion, a determination of

the applicability of the exclusion does not depend on whether

Mississippi broadly or narrowly interprets pollution exclusions.

However, the court's conclusion in Travco is relevant and

persuasive.  The court noted in Travco that "contaminant," as the

term is used in insurance contracts, has been defined as a

"substance that, because of its nature and under the particular

circumstances, was not generally supposed to be where it was

located and caused injurious or harmful effects to people,

property, or the environment."  Id. at 718 n.9 (quoting Hastings

Mut. Ins. Co. v. Safety King, Inc., 286 Mich. App. 287, 778 N.W.2d

275 (2009)); see also Hastings Mut. Ins. Co., 778 N.W.2d at 280

("contaminate" means "to make impure or unsuitable by contact or

mixture with something unclean, bad, etc.," and "something that

contaminates or carries contamination")(quoting Random House

Webster's College Dictionary (1997)); American Cas. Co. of

Reading, Pa. v. Myrick, 304 F.2d 179, 183 (5th Cir. 1962) (finding

definition of "contamination" as the "'state of being

14

contaminated; an impurity; that which contaminates; to make
inferior or impure by mixture; an impairment of purity; loss of
purity resulting from mixture or contact' [to be] consistent with
common understanding, <u>see</u> Webster's New International Dictionary,
contamination, contaminate, which is the proper criterion for
construing words in an insurance policy").

The <u>Travco</u> court concluded that "[t]he sulfur gas in the Ward
Residence clearly fits within this definition, because it was not
'supposed to be' in the Residence and it has harmed Defendant and
the components of his home."  715 F. Supp. 2d at 718 n.9.  Other
cases have found a contamination exclusion unambiguous, and
applicable in analogous circumstances on the basis of the same or
similar definitions of "contamination."  <u>See</u>, <u>e.g.</u>, <u>Conde v. State</u>
<u>Farm Fire & Cas. Co.</u>, 43 F.3d 1471, 1994 WL 705073, 2 (6th Cir.
1994)(Table) (applying Webster's Third International Dictionary's
definition of contamination as "unfit for use by the introduction
of unwholesome or undesirable elements" to find that insured's
home was "contaminated" where it had been negligently treated for
termites with chlordane, resulting in adverse health effects and
forced insureds to move from home); <u>Hartory v. State Auto. Mut.</u>
<u>Ins. Co.</u>, 552 N.E.2d 223 (Ohio App. 1988) (applying Webster's
definition and holding that contamination exclusion precluded
coverage for damages resulting when methane gas from a neighboring
landfill penetrated the plaintiffs' home forcing them to
evacuate); <u>Auten v. Employers Nat. Ins. Co.</u>, 722 S.W.2d 468

(Tex.App.–Dallas 1986) (holding that insureds' loss resulting from exterminator's misapplication of pesticides which rendered their home uninhabitable, was caused, as matter of law, by contamination and, thus, was excluded under terms of all-risks homeowners' policy); St. Mary's Area Water Auth. v. St. Paul Fire & Marine Ins. Co., 464 F. Supp. 2d 397, 415 (M.D. Pa. 2006) (finding that escape of chlorine gas resulting in the cloud of hydrochloric and hypochlorous acids that settled on equipment throughout the insured premises met definition of "contamination," as "it rendered the covered property unfit for use by the introduction of unwholesome or undesirable elements by entering into or coming in contact with the covered property"), vacated on other grounds, 472 F. Supp. 2d 630 (M.D. Pa. 2007).  The same analysis applies here, and leads the court to conclude that the contamination exclusion in Alfa's policy applies to preclude coverage for the Bishops' claimed losses.

Corrosion

The Bishops allege the sulphurous gases released by the Chinese drywall in their home resulted in "corrosion to HVAC coils, and refrigerator units, household appliances, wires, tubes and pipes...."  Alfa contends the Bishops' claims for coverage relating to corrosion fall within the exclusion for "any loss to the property ... which is directly or indirectly caused by ... corrosion."  The Bishops, citing Finger and Trus Joist Macmillan v. Neeb Kearney & Co., No. Civ.A.99-2964, 2000 WL 306654 (E.D. La.

16

Mar. 23, 2000), respond that the corrosion exclusion is inapplicable since their loss is not "caused by corrosion" but rather *is* the corrosion.  See <u>Finger</u>, 2010 WL 1222273, 6 (holding that corrosion exclusion did not bar coverage for corrosion resulting from Chinese drywall, because "[t]he exclusion is intended to apply where corrosion, rust or the like is the cause of the property damage; it is not designed to preclude coverage when the rust or corrosion is the damage itself."); <u>Trus Joist</u>, 2000 WL 306654, 2 (holding that "the exclusion is designed to apply where corrosion, rust, or the like is the cause of property damage.  It is not designed to preclude coverage when rust is the damage itself, as opposed to the cause of the damage.").

The insureds in <u>In re Chinese Drywall Litigation</u>, and in <u>Travco</u> made the identical argument as the Bishops, but in both cases, the courts rejected their position and found that the subject policies' corrosion exclusions barred coverage for damages relating to corrosion.  The court in <u>Travco</u> explained that the weight of authority supported the insurer's position:

> As a general rule, "[e]xclusions for damages caused by 'corrosion' precludes [sic] recovery for any damage caused to property because of contact with any corrosive agent.  Most jurisdictions hold that an exclusion for damages caused by corrosion precludes recovery for damages caused by corrosion regardless of what caused the corrosion or how suddenly the corrosion occurred."

<u>Travco</u>, 715 F. Supp. 2d at 714 (quoting 11 <u>Couch on Ins.</u> § 153:80).  The court agreed with this view for two reasons:

> First, the ordinary meaning of corrosion includes the "action or process of corroding."  Oxford English

17

Dictionary (2d Ed. 1989).  As it is undisputed that the damage to the "structural, mechanical and plumbing systems" of the Ward Residence was caused by the "action or process of corroding," the corrosion exclusion unambiguously applies.  <u>See</u> <u>Kay v. United Pac. Ins. Co.</u>, 902 F. Supp. 656, 658 (D. Md.1995) (applying corrosion exclusion on these grounds).  Second, Defendant's position would tend to render the corrosion exception meaningless.  As the court stated in <u>Bettigole v. American Employers Insurance Co.</u>, 30 Mass. App. Ct. 272, 567 N.E.2d 1259, 1262 (1991), if Defendant's "view were adopted, the corrosion exclusion would tend to disappear altogether because some similar agent of the process could always be identified."

<u>Id</u>. at 714-15.

The court in <u>In re Chinese Drywall Litigation</u> also found the <u>Bettigole</u> court's observation sound, and further finding Louisiana law to hold that corrosion-related loss triggers the corrosion exclusion, the court "decline[d] to create a distinction between corrosion as a loss and corrosion as a cause of the loss for purposes of the corrosion exclusion."  759 F. Supp. 2d at 848. The court considered that exclusion of corrosion-related losses was "consistent with the ordinary meaning of corrosion which is expansive, encompassing the action, process, effect and product of corroding."[5]  <u>See also</u> <u>Ross</u>, 2011 WL 2328271, 2 (finding corrosion

---

[5]     Judge Fallon noted in <u>In re Chinese Drywall Litigation</u> that the Civil District Court for the Parish of Orleans in <u>Finger</u> had relied upon <u>Trus Joist Macmillan v. Neeb Kearney & Co.</u>, 2000 WL 306654 (E.D. La. Mar. 23, 2000), in holding that the corrosion exclusion did not apply to the corrosive damage caused by Chinese drywall in the plaintiff's home; but he persuasively set forth his view that such reliance was misplaced, since the reasoning in <u>Trus Joist</u> was contradicted by <u>Central Louisiana Electric Co., Inc. v. Westinghouse Electric Corp.</u>, 579 So. 2d 981 (La. 1991), in which the Louisiana Supreme Court "made clear that corrosion-related loss triggers the corrosion exclusion in an insurance policy." 759 F. Supp. 2d at 848.

exclusion applicable to damages from Chinese drywall).  For these same reasons, the court concludes the corrosion exclusion in Alfa's policy applies to the Bishop's corrosion-related losses.

Faulty Materials

While Alfa's policy excludes coverage for loss or damage caused by "any defect, inadequacy, fault, unsoundness or weakness in material used in construction," i.e. the "faulty materials" exclusion, the policy itself does not define "defect" or "fault," and no Mississippi case defines these terms in the context of a defect or faulty materials exclusion in a homeowners' policy.  The Bishops note that in Merriam-Webster Dictionary, "fault" is defined as "a physical ... imperfection or impairment," and "defect" as "an imperfection that impairs worth or utility." Http://www.merriam-webster.com/dictionary.  And Black's Law Dictionary (9th ed. 2009) defines "material" as "of or relating to matter; physical".  On the basis of these definitions, the Bishops reason that since the Chinese-manufactured drywall in their homes is functioning properly and serving its intended purposes, its utility is in no way impaired and thus it is not "faulty" and the exclusion should not apply to preclude coverage of their claim.

Three courts have considered and rejected this very argument. As here, the insurer in Travco argued that the exclusion for "loss caused by ... [f]aulty, inadequate or defective ... [m]aterials used in ... construction ... of part or all of the property" applied "to preclude coverage of all damage resulting from the

19

defect in the drywall," whereas the insured contended the exclusion did not apply because the Chinese Drywall "[was] serving its normal function and purpose and has not caused damage to itself." 715 F. Supp. 2d at 712.  The court was skeptical of the argument that the drywall was "serving its intended purpose":

> Although the Drywall has not collapsed or otherwise physically deteriorated, it is certainly not serving its purpose as a component of a livable residence.  In any event, Defendant's argument-that an item cannot be faulty or defective if it is "serving its intended purpose"-is contrary to ordinary English usage.  In common parlance, the word "faulty" is not limited to faults that prevent an entity from accomplishing its intended purpose and itself.  See Oxford English Dictionary (2d Ed. 1989) (defining "faulty" as "[c]ontaining faults, blemishes or defects; defective, imperfect, unsound").  The same principle applies to the word "defective."

Id. at 712-713.  It noted, moreover, that in his state court lawsuit, the insured had himself repeatedly described the drywall as "defective"; and while this was not determinative, the court considered that "in the absence of some evidence that the parties intended to assign a specialized meaning to the word 'defective' in the Policy, the fact that Defendant himself described the Drywall as 'defective' certainly weighs in favor of the application of the exclusion."  Id. at 713.

As in Travco, Judge Fallon in In re Chinese Drywall Litigation found that Chinese-manufactured drywall was subject to the "faulty materials" exclusion in the plaintiffs' homeowners' policies, and that the loss resulting therefrom was excluded from coverage.  759 F. Supp. 2d at 845.  The court likened the drywall

to materials containing asbestos and lead in buildings, which had
been found to trigger the "faulty materials" exclusion, and to
radioactive table bases which in <u>Falcon Products, Inc. v.
Insurance Co. of the State of Pennsylvania</u>, 615 F. Supp. 37 (E.D.
Mo. 1985), had been found to fall within the "faulty materials"
exclusion because, while they could serve their intended purpose
as table bases, they were "unusable" because of the contaminated
materials used in constructing them.  <u>Id</u>. at 845.  The court
observed that

> [a]lthough the drywall serve[d] its intended purpose as
> a room divider, wall anchor, and insulator, the
> allegations in the complaints provide that the drywall
> emits foul-smelling odors and releases gases which
> damage silver and copper components in the home,
> including electrical devices, appliances, and wiring.
> Accordingly, the drywall is like the radioactive table
> bases and building components containing asbestos or
> lead which function for all practical purposes as table
> bases and building components, but are faulty because
> the materials of which they are composed.

759 F. Supp. 2d at 845-46.  The court opined that

> The broad definition of faulty materials under common
> usage of a defect or imperfection in a physical thing
> lends further support to the finding that the Chinese
> drywall constitutes a faulty material.  Furthermore, as
> the <u>Travco</u> court recognized, it is inconsistent to argue
> that Plaintiffs have suffered a loss due to the Chinese
> drywall, but that the drywall is not in any way faulty.
> The whole basis of the Plaintiffs' claims is that the
> Chinese drywall in question was faulty and rendered
> homes unlivable.

<u>Id.</u> at 846.

     And most recently, in <u>Ross</u>, the court, citing <u>Travco</u>, agreed
with the insurer's position and found that "even if the drywall is
still in place in the home, it is not truly serving its intended

purpose as a component of a livable residence because of its inherent qualities of emitting the sulfuric gas." <u>Ross</u>, 2011 WL 2328271, 2.  This court concurs fully with the courts' reasoning and conclusion in these cases, and accordingly, concludes that the losses claimed by plaintiffs herein are subject to the "faulty materials" exclusion in Alfa's policy.[6]

<u>Ensuing Loss</u>

The Bishops' policy provides for coverage for ensuing losses from contamination and corrosion, providing that notwithstanding the exclusions, coverage is afforded "for any resulting loss ...

---

[6]    Plaintiffs' complaint, in which the following allegations appear, repeatedly alleges that the drywall in their home was defective:

> The new home they purchased from Defendant Sturdivant had been constructed with *defective Chinese manufactured drywall* that was causing all of the problems in the home, the unexplained adverse health effects, and causing the home to be uninhabitable;

> the Defendant Sturdivant is aware of *the defective nature of the Chinese-manufactured drywall* that he used in the construction of [their] home ...;

> the Defendant Sturdivant, despite his knowledge of *the defective nature of the Chinese-manufactured drywall*, ... knowingly *used the defective product* in the construction of their home...;

> Defendant Sturdivant knew our should have known that *the drywall used in constructing the home was defective, did not function as intended and/or created a high risk of unreasonable, dangerous side effects*, ... thereby rendering the home uninhabitable; and

> the construction and sale of the home to the Plaintiffs *containing defective Chinese-manufactured drywall* constitutes a breach of express and implied warranties of habitability and other warranties ....

provided that the loss itself is a loss insured by Section I."
Similarly, the ensuing loss provision with respect to the faulty
materials exclusion provides coverage "for any ensuing loss from
[faulty materials] unless the ensuing loss is itself a loss not
insured by Section I."  These provisions extend coverage for
ensuing or resulting losses which (1) constitute covered losses,
(2) not excepted from coverage by any coverage exclusion.  Again,
the policy does not define "ensuing loss," and there are no
Mississippi cases addressing an "ensuing loss" provision.  Courts
in this circuit have consistently held, however, that such
provisions contemplate a separate and distinct loss which ensues
or follows the first one, and which is "different in kind, not
merely in degree."  See, e.g., Aetna Cas. and Surety Co. v. Yates,
344 F.2d 939 (5th Cir. 1965)(ensuing loss provision applies only
where excluded loss and ensuing loss are "in some sense separable
events"); Dillard Univ. v. Lexington Ins. Co., Civ. Action No.
06-4138, 2009 WL 1565943, 2 (E.D. La. June 3, 2009) (explaining
that "[t]o meet the ensuing loss exception... the damage must be a
separable event 'different in kind, not merely different in
degree'")(quoting Alton Ochsner Medical Foundation v. Allendale
Mut., 219 F.3d 501, 506 (5th Cir. 2000)); Holland v. Breaux, No.
Civ.A. 04-3028, 2005 WL 3542899, 5-6  (E.D. La. Nov. 22, 2005)
(stating that "[t]he 'ensuing loss' provisions in the policy's
exclusions... provide coverage for loss that is separate and
extraneous from the original damage"); Holden v. Connex-Metalna,

23

No. Civ. A. 98-3326, 2000 WL 1876338, 6 (E.D. La. Dec. 21, 2000)
(for ensuing loss provision to apply, "there must be a distinct
separation between the excluded loss and the ensuing loss.  If the
subsequent damage is merely a manifestation or worsening of the
original excluded loss, then it must be excluded.").

In both Travco and In re Chinese Drywall Litigation, the
courts found the ensuing loss provisions did not create coverage
for the insureds' claimed losses relating to the Chinese drywall
in their homes.  In Travco, the court wrote:

> [N]one of the losses claimed qualify as 'ensuing'
> losses.  An ensuing loss is a loss that occurs
> subsequent in time to an initial loss.  In the present
> case, only a single claimed loss has occurred.  The
> Chinese Drywall released reduced sulfur gases which
> harmed Defendant, members of his family, and items of
> personal property inside the Ward residence.  Although
> this damage occurred gradually over a period of time, it
> still represents a single discrete loss from a single
> discrete injury, namely the off-gassing of defective
> Chinese Drywall.

Travco, 715 F. Supp. 2d at 718-19.  In In re Chinese Drywall
Litigation, Judge Fallon noted that the insureds claimed damages
from odors and corrosion of metal components and electrical wiring
and devices from the emission of gases by the Chinese drywall in
their homes.  The court found the losses caused by the odors
emitted by the Chinese drywall were not ensuing "because they
[were] neither sufficiently different in kind from the losses
caused by the Chinese drywall, nor the result of an extraneous
event.  The odors [were] inseparable from the drywall and are a
continuous result of the drywall" and not the result of a second

24

accident.  759 F. Supp. 2d at 850-51.  Presumably on the same
reasoning, the court also found the corrosion-related losses
caused by Chinese drywall did not constitute ensuing losses,
though it held, alternatively, that even assuming for the sake of
argument that these qualified as ensuing or resulting losses, they
were still excluded losses because corrosion and corrosion-related
losses were specifically excluded from coverage.  Id. at 851
("Whether the Chinese drywall in Plaintiffs' homes causes
corrosion pitting or residue on a metal pipe, wire, or surface, or
causes more extreme loss, such as the failure of a system, device,
or appliance in which these metal components are located, because
these losses are the result of corrosion, they are excluded from
coverage.").  This court can fathom no basis for a different
result in the case at bar.

Loss of Use

Alfa contends the policy does not provide coverage for the
Bishops' alleged loss of use of their home resulting from the
Chinese drywall for the reason that the policy's loss of use
coverage is dependent on coverage of the underlying losses.  The
Bishops do not contend otherwise.  As the court has concluded that
coverage is not provided for the Bishops' underlying losses, so,
too, there is no coverage for their claimed loss of use.

Personal Injury

Alfa maintains its policy provides no coverage for the
Bishops' alleged respiratory illnesses, severe headaches or any

25

sickness, illness or medical bills or charges for or to family members from their exposure to the Chinese drywall and gases emitted therefrom.  Plaintiffs do not challenge Alfa's position, which is well-grounded in the policy.

Conclusion

Based on the foregoing, it is ordered that Alfa's motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 16th day of June, 2011.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE